## A10A0607. MUSSMAN v. THE STATE.
(697 SE2d 902)

BARNES, Presiding Judge.

Aron Mussman appeals the trial court's denial of his motion to suppress evidence or dismiss the indictment against him for vehicular homicide following a single-car accident during which the other occupant died. He argues that the State violated OCGA § 17-5-56 (a) and his due process rights by failing to preserve constitutionally material evidence that he needed to defend himself, which was the vehicle from which the State acquired the evidence it intends to use against him. He further contends the State acted in bad faith by failing to preserve the evidence and by waiting for six months to inform him that he was a suspect. Because we find that the State violated the statute requiring it to preserve physical evidence from which it obtained biological material, and acted in bad faith by failing to preserve constitutionally material evidence, the trial court erred and we reverse.

On October 9, 2007, Mussman was involved in a single-car accident in which the other occupant of the car, Daniel Stephens, died of blunt force trauma to his head and chest.[1] The accident occurred when the car, a Mazda Miata convertible, slid counterclockwise and rolled, landing upside down. After examining the positions of the seat belts at the scene, the investigating police officer concluded that the passenger had been wearing a seat belt but the driver had not been wearing one. In his preliminary report, the officer said Mussman, who was not injured, had been the passenger and Stephens had been driving. Mussman was questioned and released from the scene with no indication he was suspected of criminal activity.

The police impounded the car, photographed it, and removed samples of biological evidence from the interior. On October 29, 2007, without notice of the contemplated criminal charges against Mussman, the State released the car to a towing service. Mussman's father contacted the car's insurer, and the company paid Mussman for the total loss. About three weeks later, Mussman gave the police a statement, and again received no indication he was suspected of a

---

[1] Although the State in its brief cites to a transcript of Mussman's bond hearing, that transcript was not made part of the record on appeal. Thus, we cannot consider it. *Damani v. State*, 284 Ga. 372, 373 (1) (667 SE2d 372) (2008).

crime. The father testified that he and Mussman never considered preserving or maintaining the car themselves because they had no idea Mussman would be charged with anything related to the accident and would need evidence from the vehicle for his defense.

In April 2008, six-and-a-half months after the collision and approximately six months after the State released the vehicle, the investigating officer obtained a warrant for Mussman's arrest. In July 2008, Mussman was indicted for homicide by vehicle, accused of causing Stephens' death by recklessly speeding and failing to maintain his lane. His attorney immediately hired an investigator to find the car, which had been purchased by a salvage wholesaler. The investigator determined that the salvager sold the car in January 2008 to a mechanic in Quebec, who cleaned, repaired, repainted, and resold the vehicle, thus rendering it useless for purposes of an independent examination.

Mussman moved to dismiss the indictment and suppress any evidence the State obtained in violation of his constitutionally guaranteed right to examine critical evidence to be used against him. He argues that the State acted in bad faith by failing to maintain the car or inform him that he was a suspect before releasing the car. At a hearing on the motion, the officer admitted that law enforcement in Gwinnett County only keep cars in vehicular homicide cases they consider "unsolved." Once they "solve" a case, they release the car. Here, the investigating officer examined the vehicle first at the scene, then at the impound lot two days later, then a third time with the county medical examiner the next day. The officer took multiple photographs of the car's interior and exterior, selecting views he thought were "appropriate."

The medical examiner testified that Stephens, who was 6' 2" and 147 pounds, had sustained numerous injuries in the crash, including multiple bruises, scrapes, broken facial bones and skull fractures. The left side of his head was flattened; he had mud in his mouth; and he had sustained an injury on the right back side of his head. The medical examiner looked at Stephens' clothing but did not see anything that she thought had any evidentiary value, although she did not know if the clothing had been cut at the hospital or torn during the wreck. The clothing was not photographed or saved.

Both the State and Mussman agree that the car's passenger had been wearing a seat belt and the driver had not been. The medical examiner and the investigating officer concluded that the pattern of an injury on the back of Stephens' head appeared to be "consistent with" a hinge located on the convertible top behind the passenger seat. This match led them to believe that Stephens had been the seat-belted passenger and Mussman had been the unbelted driver. The medical examiner saw no marks indicating that Stephens had

been wearing a seat belt, however, and a hospital nurse told the investigating officer that Stephens bore no obvious signs he had been wearing a seat belt. The record contains no photographs of Stephens' body. A crime scene investigator recovered blood and hair from the hinge on the convertible top and sent it to the crime lab for DNA testing. The testing ultimately confirmed that the biological material came from Stephens, which is not surprising considering that Mussman was not injured in the wreck.

Mussman's expert, a certified automobile accident investigator, disagreed with the conclusion of the medical examiner and the investigating officer that Stephens had been the passenger. He testified that without access to the car itself, however, critical evidence was missing that would have corroborated his conclusion that Stephens had been driving. For example, he said, when a car rolls, an unbelted occupant becomes a "loose free object" inside the car and can strike multiple interior sites. The expert could see various stains on the interior of the driver's side door from the pictures, but could not identify what they were without a physical examination. He could not identify other interior marks from the State's pictures. An interior inspection of the car itself would have allowed him to examine the stains he could see in the pictures and any other marks made by hands, fingers, or other body parts, as well as imprints or transferences of thread, color, or pattern from clothing or shoes, all of which would have given him additional information to establish who had been driving the car. He could see from the pictures that the driver's seat belt was slightly extended but could not determine why without inspecting the mechanism.

Without a physical examination, the expert was also unable to determine how many times the car had rolled, which would have helped him determine the occupants' "kinematics," or trajectory inside the car as it rolled. While the State took multiple pictures of the car's exterior, the pictures did not show details such as the direction of striation marks in the paint on the hood. Given access to the car, the expert also could have gathered the shattered windshield glass to look for fabric, debris, or biological material.

Regarding the hinge pattern on the back of Stephens' head, the expert testified that it was unlikely that the head of a seat-belted passenger would have hit a hinge located directly behind and below his seat. He pointed out that "[t]he proximity of that piece of equipment to the passenger doesn't tell you whether the passenger hit his head on the equipment," because the unbelted driver became a loose object during the wreck and could have hit his head anywhere within the car. During the rollover, the seat belt would have tightened to hold the passenger's upper body against the seat back, and his head would have had to extend over the headrest and then

downward to strike the hinge, which would be a serious design flaw. Additionally, the car sustained no rear impact that would cause the passenger's head to slam backward.

At the end of the motions hearing, the trial court orally found no bad faith on the officers' part, although its one-paragraph written order simply denied the motion to suppress or dismiss without explanation. This court granted Mussman's application for interlocutory review.

Mussman contends that the trial court erred in finding that his federal and state due process rights would not be violated if the State prosecuted him for vehicular manslaughter using the results of its examination of the car it failed to maintain. The missing evidence was constitutionally material, and Gwinnett County law enforcement's policy of releasing it once it deems a vehicular homicide case "solved" constitutes bad faith, he asserts, as does its failure to comply with a statutory mandate to preserve the evidence. Further, he argues, it would be fundamentally unfair to try him when all of the evidence critical to his defense has been destroyed.

The State responds that no State action was involved in disposing of the car, which took place after it was released to the towing service and then under the control of Mussman and his father. Further, even if there were State action in disposing of the evidence, the State argues, it committed no due process violation because the lost evidence was not constitutionally material and the officers did not act in bad faith.

1. OCGA § 17-5-56 (a) requires the State to "maintain any physical evidence collected at the time of the crime that contains biological material, including, but not limited to, stains, fluids, or hair samples that relate to the identity of the perpetrator of the crime. . . ." OCGA § 17-5-56 (b) specifies how long the State must maintain that evidence following a conviction, depending on the type of case involved. This statute was introduced in 2003 "as part of an effort to allow the law to keep pace with technology and to try to ensure that innocent people are not kept in prison for serious crimes they did not commit." 20 Ga. St. U. L. Rev. 119 (2003) (citing an interview with the bill's co-sponsor, David Adelman). There is no reasonable issue whether the car in this case, or at least the hinge inside the car, falls within the terms of the Code section, because it was the source, indeed the only source, of the biological materials the State collected and sent to the crime lab.

The State in this case did not maintain the physical evidence containing the biological material. While it argues that the statute refers only to the biological samples themselves, which it has maintained and which are still available for further testing, by its plain language the statute does not refer only to the samples. It

directs the State to maintain "any physical evidence collected at the time of the crime that contains biological material." OCGA § 17-5-56 (a). In considering whether the absence of State evidence violated the Due Process Clause, the United States Supreme Court noted that state legislatures "remain free to adopt more rigorous safeguards governing the admissibility of scientific evidence than those imposed by the Federal Constitution." *California v. Trombetta*, 467 U. S. 479, 491, n. 12 (104 SC 2528, 81 LE2d 413) (1984). OCGA § 17-5-56 does not give the State the discretion to keep only the evidence it deems appropriate or necessary, but directs it to maintain *all* physical evidence containing biological material that was collected at the time of the crime. The State violated the statute in this case by failing to maintain the physical evidence containing the biological material from which it obtained DNA.

2. The statute itself contains no remedy for its violation. OCGA §§ 17-5-55 and 17-5-56 address the disposition of property seized rather than the use of that property as evidence.[2] When the legislature amended these Code sections, it also gave defendants a new ground for extraordinary motions for new trial based on DNA evidence in certain circumstances, OCGA § 5-5-41 (c), and gave prosecutors the opportunity to appeal a trial court's decision to grant such an extraordinary motion for new trial. OCGA § 5-7-1.

While Mussman argues that the proper remedy for the State's complete failure to abide by its statutory duty under OCGA § 17-5-56 (a) is to exclude from trial any evidence obtained from the car, we must consider why the legislature passed this statute to determine the proper remedy. "In construing a statute, the cardinal rule is to glean the intent of the legislature. Language in one part of the statute must be construed in the light of the legislative intent as found in the statute as a whole." (Citation and punctuation omitted.) *Goldberg v. State*, 282 Ga. 542, 544 (651 SE2d 667) (2007). Also see generally *Butterworth v. Butterworth*, 227 Ga. 301, 303-304 (180 SE2d 549) (1971), which sets out the

> elementary rule of statutory construction that a statute must be construed in relation to other statutes of which it is a part, and all statutes relating to the same subject-matter, briefly called statutes "in pari materia," are construed together, and harmonized wherever possible, so as to ascertain the legislative intendment and give effect thereto.

Accord *Snyder v. State*, 283 Ga. 211, 213-214 (657 SE2d 834) (2008).

---

[2] OCGA §§ 17-5-55 and 17-5-56 are found in Article 3, titled "Disposition of Property Seized."

Considering that the act amending this statute also amended the Code sections allowing extraordinary motions for new trial based on DNA testing and allowing the State to appeal the grant of such motions, the legislature clearly intended this statute to provide a means to safeguard a defendant's ability to seek post-conviction remedies based on DNA testing, and allow a person to establish that he or she was not guilty, rather than addressing the requirements for introducing evidence at trial. Thus, in this case we cannot conclude, without further consideration, that the State's violation of the statute automatically results in the exclusion from trial of evidence gleaned from the missing car.

3. In addition to the biological evidence, the State also has photographs of the missing car. Mussman contends that the State's failure to preserve the vehicle from which it gathered the material it would use to prosecute him violated his right to due process, because the evidence was constitutionally material and the State acted in bad faith. He also argues it would be fundamentally unfair to try him using evidence he had no opportunity to inspect himself. The State responds that the evidence was not constitutionally material; the police did not act in bad faith; and Mussman could develop a sufficient defense because he had access to all of the State's evidence against him.

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *Trombetta*, supra, 467 U. S. at 485. In *Trombetta*, the court concluded that the Due Process Clause did not require law enforcement agencies to preserve the breath samples of suspected drunken drivers for the results of breath-analysis tests to be admissible in criminal prosecutions. First, the officers in that case did not destroy the breath samples in a conscious effort to suppress exculpatory evidence, but acted " 'in good faith and in accord with their normal practice.' [Cit.]" Id. at 488. Second, the court held that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." Id. at 488.

Such constitutionally material evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, supra, 467 U. S. at 489. In *Trombetta*, the chances were extremely low that preserved breath samples would have been exculpatory, and the defendant had other means of attacking the

accuracy of the testing device, so the court found no due process violation in the State's failure to preserve the breath samples. Id. at 490-491.

Four years later, the United States Supreme Court again examined the states' duty to preserve evidence "that might be useful to a criminal defendant," specifically the duty to preserve semen samples from a victim's body and clothing. *Arizona v. Youngblood*, 488 U. S. 51, 52 (109 SC 333, 102 LE2d 281) (1988). In *Youngblood*, the police obtained biological samples, which were initially only examined to determine whether sexual conduct had occurred. Later tests to narrow the pool of possible defendants were useless, and experts testified at trial about what "might have been shown" by tests performed more promptly or on better preserved samples. The trial court charged the jury that if it found the State had destroyed or lost evidence, they might infer that the evidence would have been against the State's interest, and the jury convicted the defendant of child molestation, sexual assault, and kidnapping. Id. at 53-54.

Comparing the facts in *Youngblood* to those in *Trombetta*, the Supreme Court held that (1) the possibility that the semen samples could have exculpated the defendants if preserved or tested is not enough to constitute "constitutional materiality"; and (2) the exculpatory value of the evidence must be apparent before it was destroyed, which the defendant did not show here. *Youngblood*, supra, 488 U. S. at 56. The court continued: *"The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."* (Emphasis supplied.) Id. While good or bad faith is irrelevant if the State fails to disclose material exculpatory evidence, the court held, it is relevant when considering the State's failure to preserve evidence which only *might have* exonerated the defendant. Id. at 57. In summary, the court held that

> requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

Id. at 58.

When the State fails to preserve evidence which might have exonerated the defendant, the court must determine both whether the evidence was constitutionally material — of apparent exculpatory value and incomparable — and whether the police acted in bad faith in failing to preserve it. See, e.g., *Ballard v. State*, 285 Ga. 15, 16 (2) (673 SE2d 213) (2009); *Walker v. State*, 264 Ga. 676, 680-681 (3) (449 SE2d 845) (1994).

(a) The State argues that the evidence it failed to preserve was only potentially, not apparently, exculpatory. It also argues that Mussman could obtain comparable evidence by other reasonably available means, such as inspecting the State's photographs of the car. Mussman could also inspect any other Mazda Miata for comparison, the State argues, because "[n]othing about [the expert's] theory is unique to the exact car in question, such as the condition of the brakes or similar mechanical flaw." To the contrary, however, the evidence was apparently exculpatory, and inspecting the State's photographic record or a similar car does not yield comparable evidence.

Mussman's expert witness testified that even from the State's pictures he could see marks, stains, and scratches inside and outside the car that would have helped him establish that Mussman was the passenger if he could have examined the car itself. The exculpability of this evidence was apparent to the expert from the photographs, and thus should have been apparent to the State when it examined the car. Further, as the expert testified, the State's photographs do not show the level of detail required to properly reconstruct the accident, such as the direction of paint scratches on the outside of the car or the source and location of stains in the interior. Finally, a different Miata obviously would not contain the external damage or the internal bloodstains and transfer marks that the accident reconstructionist needed to determine what happened to the occupants as the car rolled. The evidence the State failed to preserve was thus constitutionally material because it was apparently exculpatory and Mussman could not obtain comparable evidence by any reasonably available means.

(b) To determine whether the destruction of potentially exculpatory evidence rises to a due process violation, we consider whether the State acted in bad faith. In addition to the State's violation of its statutory duty to maintain evidence per OCGA § 17-5-56 (a), its release of the vehicle after it gathered the evidence it considered necessary to prosecute Mussman, as well as its six-month delay in notifying Mussman he was a suspect, constitute bad faith. Contrary to the State's emphatic declaration at oral argument that it had no duty to preserve the car, the State has a constitutional duty to preserve evidence "that might be expected to play a significant role

in the suspect's defense." *Trombetta*, supra, 467 U. S. at 488. In this case the State knew the car would play a significant role in Mussman's defense; indeed, there was no other physical evidence to consider other than Stephens' body and clothing, which Mussman also had no opportunity to examine. The State preserved only biological material obtained from one spot in the car, gathered by a crime scene investigator upon direction from the police and medical examiner, and took photographs. Any other physical evidence, inculpatory or exculpatory, is gone forever because once the police concluded Mussman was guilty and obtained the evidence they wanted, they released the car. These actions ensured that only the State's viewpoint was preserved for trial, leaving Mussman to mount a defense by attempting to analyze whatever evidence the State thought was important to prosecute the case.

Under the circumstances of this case, if not in all instances, Gwinnett County law enforcement's policy of releasing evidence in vehicular homicide cases it deems to be "solved," with no concomitant policy of notifying a future defendant that he is a suspect when it releases that evidence, constitutes bad faith. Delaying Mussman's arrest for six months, until the car was almost certainly useless forensically, also constitutes bad faith.

The State argues that it properly delayed arresting Mussman until it obtained the crime lab report on the biological material it collected from the car. At the motions hearing the State contended that the officer did not "rush to judgment on this case," but "waited until [the physical] evidence got back from the crime lab" five months later. The argument that the State had to wait to make sure the biological material on the hinge belonged to Stephens is not persuasive, however, as the only occupant injured in the wreck was Stephens. The laboratory report confirming that it was Stephens' DNA on the hinge added no additional information justifying the delay in notifying Mussman that he was a suspect.

The State further argues that any destruction of evidence was not due to the State's actions, because Mussman had access to the car once the State released it to the towing company. This argument is disingenuous at best and perfectly consistent with a plan of concealing its true intention when seemingly innocently releasing the car to Mussman without notice of the pending charges to be filed against him. Having access to a totaled car without knowing he was suspected of killing someone while driving it realistically gave Mussman no opportunity to have an expert look at the car. The State has the obligation to preserve evidence it intends to use against the defendant; no defendant has the duty to preserve evidence, such as his totaled car, because the State might possibly bring charges against him one day.

The holdings in *Jackson v. State*, 258 Ga. App. 806 (575 SE2d 713) (2002) and *Ransby v. State*, 273 Ga. App. 594 (615 SE2d 651) (2005) do not require a different result. In *Jackson*, no usable biological material was found in the car, which the police offered to the defendant *after* he was charged. In *Ransby*, the State did not know the car contained possibly exculpatory evidence before they released it. Here, the police concluded Mussman was criminally at fault, obtained all the evidence it thought necessary to prosecute him, then released the car without telling Mussman he was a suspect until six months later, in violation of Mussman's due process rights as well as the requirements of OCGA § 17-5-56.

The State argues:

> If there is bad faith here, by inference, there must be bad faith in every case in which a motor vehicle is seized, held until the examination is completed, and then released! Such a proposition is unrealistic to the point of absurdity. Requiring the indefinite retention of the Mazda would impose the "undifferentiated and absolute duty" the Supreme Court of the United States declined to require. *Arizona v. Youngblood*, [supra, 488 U. S. at 58].

As a generic proposition, the State is correct that it would be absurd to expect the prosecution to retain indefinitely every motor vehicle seized and examined. But this vehicle was not just seized and examined. The State seized the car, concluded its owner was criminally responsible for someone's death because the decedent hit his head on a hinge near the passenger seat, obtained evidence from the car, and quickly released it to a towing service without telling the owner he was suspected of causing a death either then, or three weeks later, when he voluntarily came to the police station and gave a statement. The State then waited six months until it obtained scientific confirmation that the biological material it obtained from inside the car belonged to the only occupant injured in the wreck, then charged the owner, long after the car was useless forensically.

Finally, the State suggests that this court "await guidance" and refrain from deciding this case until after the Supreme Court of Georgia issues its opinion in another due process case involving the State's destruction of evidence. The Supreme Court granted the State's petition for certiorari in that case to consider "the proper standard for analyzing whether destruction of potentially exculpatory evidence rises to a due process violation." *State v. Miller*, 298 Ga. App. 584 (680 SE2d 627) (2009), cert. granted (S09C1828, Jan. 11, 2010). The issue in *Miller*, however, is not identical to the issue here. There, the State destroyed the defendant's cell phone, which

according to him contained his only contact information regarding three exculpatory witnesses. The cell phone did not disgorge evidence that formed the crux of the State's prosecution. Further, the cell phone was not destroyed as the result of a department-wide policy of failing to preserve evidence after it is inspected and documented and the related crime is deemed to be solved. Further, under this State's constitutional two-term rule, Ga. Const. 1983, Art. VI, Sec. IX, Par. I, the decision in *Miller* need not necessarily be released before this case must be decided.

Based on the testimony of the defendant's expert, it was apparent that the car contained evidence that would have been exculpatory. Comparable evidence was not otherwise available through reasonable means, and the State acted in bad faith. It is not absurd or unrealistic to require the State to retain the vehicle from which it obtained the only incriminating physical evidence it intended to use in prosecuting the defendant, particularly in light of the fact that the defendant had no idea he was suspected of a crime and the State gave him no notice or indication that he would be prosecuted using evidence garnered from his totalled vehicle. For these reasons, the trial court erred in denying Mussman's motion to exclude any evidence related to the vehicle which the State failed to preserve.

*Judgment reversed. Bernes, J., concurs. Senior Appellate Judge G. Alan Blackburn concurs specially and in judgment only in Divisions 2 and 3.*

BLACKBURN, Senior Appellate Judge, concurring specially and in judgment only.

I agree with the analysis contained in Division 1 of the opinion that the State completely failed to abide by its clear and plain statutory duty under OCGA § 17-5-56 (a) to maintain all physical evidence containing biological material that was collected at the time of the crime. Specifically, the State violated the statute in this case by failing to maintain the car, from which it obtained the DNA and indeed from which it obtained *all* physical evidence (including photographs) it intended to use to prosecute Mussman for homicide by vehicle. Because the Georgia legislature has seen fit to impose this unequivocal duty on the State, and because the State wholly failed to comply with this duty, I believe that, as a matter of Georgia law, all evidence obtained from this car should be excluded from trial, especially in light of Mussman's defense which relies in key part on the exculpatory evidence this car could have given.

Therefore, I have difficulties with the holding in Division 2 that the statute alone does not require this exclusion. Nothing in the statute limits its mandate or effect to post-conviction remedies, and I believe the majority's reference to statutes in different titles of the

Code that pertain to post-conviction proceedings as limiting the plain language of OCGA § 17-5-56 (a) to post-conviction remedies is incorrect.

Accordingly, I also do not concur in Division 3 that makes the factual finding that the State acted in bad faith in releasing the car. Under a proper interpretation of OCGA § 17-5-56 (a), Division 3 is dicta only. See *Brooks v. State*[3] ("after an issue is resolved in an appellate opinion, subsequent analysis on another theory amounts to an advisory opinion or mere dicta") (punctuation omitted). Moreover, Division 3 finds as a matter of law that the State acted in bad faith, which finding is directly contradictory to the finding of the trial court which heard the evidence and judged the witnesses' credibility firsthand. See *Tate v. State*[4] ("[t]he trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony"). Here, the trial court could well have rejected the defendant's evidence as incredible and have believed instead that the State did not arrest Mussman until it received the crime lab report on the biological material it collected from the car. It is for the finder of fact, not an appellate court, to determine facts.

For these reasons, I concur in Division 1 and concur in judgment only in Divisions 2 and 3.

DECIDED JULY 6, 2010 — 

*Peters, Rubin & Sheffield, Douglas N. Peters, M. Paul Reynolds,* for appellant.

*Daniel J. Porter, District Attorney, William C. Akins, Assistant District Attorney,* for appellee.

*J. Scott Key, Koehler & Riddick, Christine A Koehler, Hogue & Hogue, Laura D. Hogue,* amici curiae.

---

[3] *Brooks v. State*, 284 Ga. App. 762, 764, n. 9 (644 SE2d 891) (2007).
[4] *Tate v. State*, 264 Ga. 53, 56 (3) (440 SE2d 646) (1994).