S10G1743. THE STATE v. MUSSMAN.
(713 SE2d 822)

MELTON, Justice.

In *Mussman v. State*, 304 Ga. App. 808 (697 SE2d 902) (2010), the Court of Appeals reversed the trial court's denial of Aron Mussman's motion to suppress evidence or dismiss the indictment against him for vehicular homicide. In reaching its decision, the Court of Appeals found that the State had acted in bad faith and committed a due process violation by failing to preserve constitutionally material evidence, and found that the State had violated OCGA § 17-5-56 (a), which reads:

Except as otherwise provided in Code Section 17-5-55, on or after May 27, 2003, governmental entities in possession of any physical evidence in a criminal case, including, but not limited to, a law enforcement agency or a prosecuting attorney, shall maintain any physical evidence collected at the time of the crime that contains biological material, including, but not limited to, stains, fluids, or hair samples that relate to the identity of the perpetrator of the crime as provided in this Code section. Biological samples collected directly from any person for use as reference materials for testing or collected for the purpose of drug or alcohol testing shall not be preserved.

We granted review to determine (1) whether the Court of Appeals erred in its application of OCGA § 17-5-56 (a), and (2) whether the Court of Appeals erred in holding that the State committed a due process violation by failing to preserve evidence. For the reasons that follow, we reverse.

The relevant facts of record, as found by the Court of Appeals, show that

[o]n October 9, 2007, Mussman was involved in a single-car accident in which the other occupant of the car, Daniel Stephens, died of blunt force trauma to his head and chest. . . . In his preliminary report, the [police] officer [who arrived at the scene] said Mussman, who was not injured, had been the passenger and Stephens had been driving. Mussman was questioned and released from the scene with no indication he was suspected of criminal activity.

The police impounded the car, photographed it, and removed samples of biological evidence from the interior. On October 29, 2007, without notice of the contemplated criminal charges against Mussman, the State released the car to a towing [company]. . . .

. . . In July 2008, Mussman was indicted for homicide by vehicle, accused of causing Stephens' death by recklessly speeding and failing to maintain his lane. His attorney immediately hired an investigator to find the car, which had been purchased by a salvage wholesaler. The investigator determined that the salvager sold the car in January 2008 to a mechanic in Quebec, who cleaned, repaired, repainted, and resold the vehicle, thus rendering it useless for purposes of an independent examination.

. . . At a hearing on [Mussman's motion to suppress the evidence police obtained from the car], the officer admitted

that law enforcement in Gwinnett County only keep cars in vehicular homicide cases they consider "unsolved." Once they "solve" a case, they release the car. . . . [Stephens'] clothing was not photographed or saved.

Both the State and Mussman agree that the car's passenger had been wearing a seat belt and the driver had not been. The medical examiner and the investigating officer concluded that the pattern of an injury on the back of Stephens' head appeared to be "consistent with" a hinge located on the convertible top behind the passenger seat. This match led them to believe that Stephens had been the seat-belted passenger and Mussman had been the unbelted driver. The medical examiner . . . and a hospital nurse [reported] no obvious signs [Stephens] had been wearing a seat belt. The record contains no photographs of Stephens' body. A crime scene investigator recovered blood and hair from the hinge on the convertible top and sent it to the crime lab for DNA testing. The testing ultimately confirmed that the biological material came from Stephens.

*Mussman*, supra, 304 Ga. App. at 808-810.

1. In interpreting OCGA § 17-5-56 (a), the Court of Appeals held that the statute required that law enforcement maintain not only biological samples, but also the "container" or "source" of the sample. *Mussman*, supra, 304 Ga. App. at 811 (1) ("There is no reasonable issue whether the car in this case, or at least the hinge inside the car, falls within the terms of the Code section, because it was the source, indeed the only source, of the biological materials the State collected and sent to the crime lab. The State in this case did not maintain the physical evidence containing the biological material"). Based on this interpretation, the Court of Appeals determined that the State violated OCGA § 17-5-56 (a) by failing to maintain the car, or at least the hinge inside the car, from which the biological samples were recovered. See id. at 812 (1). In order to determine whether the Court of Appeals' interpretation of OCGA § 17-5-56 (a) is correct, we must turn to the basic rules of statutory construction. Specifically,

we apply the fundamental rules of statutory construction that require us to construe [the] statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage. At the same time, we must seek to effectuate the intent of the legislature.

(Citations omitted.) *Slakman v. Continental Cas. Co.*, 277 Ga. 189, 191 (587 SE2d 24) (2003). Furthermore, "[t]his Court may construe statutes to avoid absurd results." (Citation and punctuation omitted.) *Allen v. Wright*, 282 Ga. 9, 12 (1) (644 SE2d 814) (2007).

With these principles in mind, the plain language of OCGA § 17-5-56 (a) reveals that governmental entities are required to maintain "any physical evidence *collected* at the time of the crime that contains *biological material,* including, but not limited to, *stains, fluids, or hair samples that relate to the identity of the perpetrator of the crime.*" (Emphasis supplied.) In listing "stains, fluids, or hair samples," the legislature gave examples of the types of evidence that the statute requires governmental entities to maintain in a criminal case. The statute does not require governmental entities to maintain any and all "containers" or "sources" (or in this case, the vehicle) that happen to house the biological material in question, just the contents of the collected biological material itself that "relate to the identity of the perpetrator of the crime." Id. Indeed, in this case, the State maintained the hair and blood samples taken from the vehicle, which was consistent with the plain language of OCGA § 17-5-56 (a). In fact, this is exactly the type of evidence that the legislature explicitly contemplated that governmental entities are required to maintain pursuant to the statute. Id.

By holding that OCGA § 17-5-56 (a) would require governmental entities to maintain not only biological materials but also the "sources" of such biological materials, the Court of Appeals has gone beyond the plain language of the statute and offered an interpretation that leads to an absurd result. Specifically, the Court of Appeals' interpretation of the statute would "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve *all* material that *might* be of conceivable evidentiary significance in a particular prosecution." (Emphasis supplied.) *Arizona v. Youngblood*, 488 U. S. 51, 58 (109 SC 333, 102 LE2d 281) (1988). The United States Supreme Court has already determined that there is no constitutional due process requirement that police maintain "all material that might be of conceivable evidentiary significance." Id. However, the Court of Appeals' interpretation of OCGA § 17-5-56 (a) would force governmental entities to, for example, preserve an entire mattress if DNA evidence were recovered from a portion of the mattress; maintain an entire recliner chair if bodily fluids were recovered from a button on the chair; maintain indefinitely the corpse of every murder victim that contains biological material from the perpetrator and every car involved in a fatal wreck; or maintain any number of large items when the relevant biological material collected from the items only takes up a tiny portion of the items themselves. The evidence rooms maintained by law enforcement

throughout the state would need to increase in capacity to unimaginable and unwieldy levels in order to accommodate the assortment of household objects, vehicles, and other "sources" of biological evidence that might be of "conceivable evidentiary significance" to the defense, when preservation of the biological material collected from the items themselves is all that would really be necessary to ensure that a defendant's due process rights would be protected in a criminal case. Id. See also OCGA § 17-5-56 (a). We reject the absurd result that would be obtained if the Court of Appeals' interpretation of OCGA § 17-5-56 (a) were allowed to stand. See *Manville v. Hampton*, 266 Ga. 857 (2) (471 SE2d 872) (1996).

2. The Court of Appeals also held that the State violated Mussman's due process rights by failing to preserve the vehicle and the victim's and Mussman's clothing. We disagree.

With respect to the specific evidence that the State failed to preserve in this case, "no more can be said [of this evidence] than . . . it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, supra, 488 U. S. at 57. To determine if a defendant's due process rights have been violated where, as here, the lost evidence *could* have been exculpatory, but where it is not known that the evidence *would* have been exculpatory, this Court considers

> whether the evidence was constitutionally material and whether the police acted in bad faith. Evidence is constitutionally material when its exculpatory value is apparent before it was lost or destroyed and is of such a nature that a defendant would be unable to obtain other comparable evidence by other reasonably available means.

(Citations omitted.) *Ballard v. State*, 285 Ga. 15, 15-16 (2) (673 SE2d 213) (2009).

The Court of Appeals pointed to testimony by Mussman's expert showing that photographs of the vehicle depicting marks, stains, and scratches could have helped Mussman establish his innocence, and held that "[t]he exculpability of this evidence was apparent . . . and . . . should have been apparent to the State" prior to the release of the vehicle. *Mussman*, supra, 304 Ga. App. at 815 (3) (a). Further, the Court held that Mussman was unable to obtain comparable evidence because a different vehicle of the same make and model would not have had the same identifying characteristics of the vehicle involved in the actual accident. See id. The Court of Appeals thus concluded that the evidence that the State failed to preserve was constitutionally material. Id.

However, assuming without deciding that the lost evidence *was*

constitutionally material, the Court of Appeals' conclusion that the State committed a due process violation by failing to preserve the evidence is still incorrect. Here, despite the fact that the trial court made a factual finding of no bad faith in this case, the Court of Appeals nevertheless determined that Gwinnett County law enforcement's "policy of releasing evidence in vehicular homicide cases it deems to be 'solved,' with no concomitant policy of notifying a future defendant that he is a suspect when it releases that evidence, constitute[d] bad faith." *Mussman*, supra, 304 Ga. App. at 816 (3) (b). Accordingly, the State allegedly engaged in bad faith and caused a due process violation by failing to preserve the evidence in question based on a standard police policy. Id. The problem with the Court of Appeals' analysis is that the Court has misconstrued the concept of "bad faith." Following a standard policy, by itself, is not evidence of bad faith. See *Terrell v. State*, 271 Ga. 783 (6) (523 SE2d 294) (1999) (no bad faith where GBI agent disposed of handwritten interview notes according to standard practice). Bad faith is reserved for "those cases in which the police themselves *by their conduct* indicate that the evidence could form a basis for exonerating the defendant." (Emphasis supplied.) *Youngblood*, supra, 488 U. S. at 58. In other words, the police must show, by their conduct, some intent to wrongfully withhold constitutionally material evidence from the defendant. Id. Here, as the trial court correctly found, there is simply no evidence of record that the police were acting in bad faith when they followed the standard policy of releasing evidence in vehicular homicide cases that they considered to be solved.[1] The Court of Appeals had no basis in the record for disturbing this factual finding of the trial court and concluding otherwise.

*Judgment reversed. All the Justices concur.*

DECIDED JUNE 13, 2011 —
RECONSIDERATION DENIED JULY 21, 2011.

*Daniel J. Porter, District Attorney, William C. Akins, Assistant District Attorney*, for appellant.
*Douglas N. Peters*, for appellee.

---

[1] This is not to say that following a standard policy may never amount to evidence of bad faith. However, the question whether bad faith would exist under such circumstances would depend on the *conduct* of the actors in relation to the policy, and not whether the policy itself constituted evidence of bad faith. For example, a standard policy could be *implemented* in bad faith, or a standard policy could be *followed* in bad faith, but, again, the focus is on the conduct in relation to the policy, not simply the policy itself. A policy, by itself, is not evidence of bad faith. See *Terrell*, supra.

*Perry & Walters, George P. Donaldson III, J. Scott Key,* amici curiae.