**FOURTH DIVISION**
**DOYLE, P. J.,**
**MILLER and DILLARD, JJ.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**October 29, 2014**

# In the Court of Appeals of Georgia

A14A0814. DAVIS v. THE STATE.

MILLER, Judge.

A jury convicted Melvin James Davis of rape (OCGA § 16-6-1 (a) (1)), aggravated child molestation (OCGA § 16-6-4 (c)), and enticing a child for indecent purposes (OCGA § 16-6-5 (a)).[1] Davis appeals from the denial of his motion for new trial, contending that (1) the State improperly destroyed evidence; (2) the trial court erroneously instructed the jury on the burden of proof; and (3) his trial counsel rendered ineffective assistance. For the reasons that follow, we affirm.

---

[1] Prior to trial, the trial court granted Davis's motion to sever additional charges of possession of cocaine with intent to distribute (OCGA § 16-13-30 (b)) and possession of marijuana with intent to distribute (OCGA § 16-13-30 (j) (1)). The State nolle prossed a charge of cruelty to a child (OCGA § 16-5-70).

Viewed in the light most favorable the verdict,[2] the evidence shows that on February 18, 2005, Davis called his ex-girlfriend, L. C., around 3:00 p.m. and told her that he had some money to give her. L. C. sent her then twelve-year-old sister, K. C., and her six-year-old son to retrieve the money from Davis at his house, which was approximately two blocks from K. C. and L. C.'s home.

K. C. and her nephew walked to Davis's house. When they arrived, Davis told K. C.'s nephew to go play with Davis's own young son and the two boys went into Davis's son's bedroom. Meanwhile, Davis told K. C. to come into his bedroom to get the money. Davis then locked the bedroom door and used both hands to pull down K. C.'s pants. Davis pulled down K. C.'s underwear and told her to get on the bed. K. C. was scared. Davis then took off his clothes and put his penis into K. C.'s vagina.

During intercourse, Davis received a call from L. C., who was worried because the children had been gone for 30 minutes. Davis got up from the bed to answer the phone and told L. C. that the children would be home soon. Davis then resumed raping K. C. until he ejaculated inside of her. The rape lasted for a total of ten to fifteen minutes.

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

Afterwards, Davis gave K. C. some money and told her that he would hurt her if she told anyone what had happened. K. C. and her nephew walked back home. When she arrived home, K. C. was walking with her legs spread apart, as if she was hurt. L. C. asked K. C. what was wrong. K. C. was afraid to tell her sister what happened but later revealed to her mother that Davis had raped her. L. C. then called the police and reported the rape.

K. C.'s mother took her to the hospital, where a sexual assault nurse conducted an exam that evening. The nurse found a fresh abrasion on K. C.'s vagina, consistent with non-consensual sexual intercourse. K. C. was also bleeding quite a bit around her cervix. The nurse swabbed K. C.'s vaginal area. Subsequent DNA testing of the swabs indicated the presence of male DNA, although the amount was insufficient to create a profile for testing.

Shortly after the rape, K. C. missed her period. On April 27, 2005, an obstetrician examined K. C. and determined, based on ultrasound measurements, that K. C. was approximately nine weeks pregnant. In early March, K. C. had an abortion at a medical clinic. After K. C.'s abortion in May 2005, biological material was collected, placed in formaldehyde, per the clinic's policy, and turned over to an investigator from the State.

3

The biological material collected from K. C.'s abortion was received by the GBI in May 2005, but was not analyzed until October 2005. A GBI forensic biologist was unable to obtain any usable DNA from the biological material, likely because the sample had been stored in formaldehyde, which can inhibit the recovery of DNA in as little as two or three days. In January 2007, the biological material was destroyed by the GBI crime lab.

1. Davis contends the State improperly destroyed the biological material collected after K. C.'s abortion, which could have shown the K. C. was impregnated after the rape, violating both OCGA § 17-5-56 and his Due Process rights. We disagree.

(a) The State did not violate OCGA § 17-5-56.

OCGA § 17-5-56 (a) pertinently provides:

> governmental entities in possession of any physical evidence in a criminal case, including, but not limited to, a law enforcement agency or a prosecuting attorney, shall maintain *any physical evidence collected at the time of the crime* that contains biological material, including, but not limited to, stains, fluids, or hair samples *that relate to the identity of the perpetrator* of the crime as provided in this Code section.

(Emphasis supplied.)

"Where the language of a statute is plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly." (Footnote omitted.) *Chase v. State*, 285 Ga. 693, 695 (2) (681 SE2d 116) (2009). OCGA § 17-5-56, by its plain language, applies to physical evidence containing biological material that could identify the perpetrator and is collected at the time of the crime. See *State v. Mussman*, 289 Ga. 586, 589 (1) (713 SE2d 822) (2011). Thus, OCGA § 17-5-56 does not apply to the biological material collected at K. C.'s abortion more than two months after the crime occurred. Moreover, by the time the sample came into the possession of the State, it had already been contaminated due to the storage procedure used by the medical clinic and there was no usable biological material that would "relate to the identity of the perpetrator." OCGA § 17-5-56 (a). Accordingly, there was no violation of OCGA § 17-5-56.

(b) The State did not violate Davis's Due Process rights when it destroyed the biological material.

> To determine if a defendant's due process rights have been violated where, as here, the lost evidence could have been exculpatory, but where it is not known that the evidence would have been exculpatory, this Court considers whether the evidence was constitutionally material and whether the [State] acted in bad faith. Evidence is constitutionally material when its exculpatory value is

5

apparent before it was lost or destroyed and is of such a nature that a defendant would be unable to obtain other comparable evidence by other reasonably available means.

(Citation omitted.) *Mussman*, supra, 289 Ga. at 590 (2).

Here, while Davis may not have been able to obtain comparable evidence, the biological material could not be considered constitutionally material because it had no apparent exculpatory value at the time the State received it. Notably, the evidence shows that the biological material from K. C.'s abortion was contaminated by formaldehyde. The fetal sample thus had no exculpatory value because no DNA could be extracted from it.[3]

Even assuming that the destroyed evidence was constitutionally material, there is no evidence that the State engaged in bad faith. The private clinic's contamination of the sample cannot be attributed to the State. See *State v. Brady*, 287 Ga. App. 626, 627 (653 SE2d 72) (2007) (no bad faith on the part of the State where hospital

---

[3] Even if the fetal sample had some slight evidentiary value, that is, assuming it could show the age of the fetus, such evidence would have been cumulative to the doctor's testimony and does not rise to the level of material exculpatory evidence. See *Krause v. State*, 285 Ga. 745, 752 (8) (691 SE2d 211) (2010); see also *Clay v. State*, 290 Ga. 822, 842 (5) (C) (725 SE2d 260) (2012) (blood samples that might have shown that defendant was on drugs at time of crime were not constitutionally material).

destroyed child's vaginal swab in accordance with its policy). Bad faith is reserved for those cases in which the State's conduct indicates that the evidence could form a basis for exonerating the defendant. See *Mussman*, supra, 289 Ga. at 591 (2). Here, the State destroyed the biological material after discovering that it had no usable DNA. Consequently, the State's destruction of the evidence cannot be said to have been in bad faith.

2. Davis contends that the trial court erred in charging the jury on the burden of proof, specifically, the court's instruction that "the burden shifts to the defendant to prove innocence." We disagree.

With regard to the burden of proof, the trial court instructed the jury as follows:

This defendant enters upon the trial of this case with the presumption of innocence in his favor. This presumption remains with the defendant until it is overcome by the state of the evidence which is sufficient to convince you beyond a reasonable doubt that the defendant is guilty of the offense or offenses charged.

No person shall be convicted of any crime unless and until each element of a crime is proven beyond a reasonable doubt. The burden of proof rests upon the [S]tate to [prove] every material allegation of the indictment and every essential element of the crime beyond a reasonable doubt. . . .

*There is no burden of proof upon the defendant whatever, and the burden shifts to the defendant to prove innocence.* However, the [S]tate is not required to prove the guilt of the accused beyond all doubt or to a mathematical certainty.

A reasonable doubt means just what it says. It is the doubt of a fair-minded, impartial juror, honestly [seeking the truth]. It is a doubt based on common sense and reason. It does not mean a vague or arbitrary doubt, but is a doubt for which a reason can be given. And that doubt may arise from a consideration of the evidence, a lack of evidence, a conflict in the evidence, or any combination of these elements.

If, after giving consideration to all these facts and circumstances of the case your minds are wavering, unsettled, or unsatisfied, then that is a doubt of the law and you should acquit the defendant. But, if that doubt does not exist in your minds as to the guilt of the accused, then you would be authorized to convict the defendant. If the [S]tate fails to prove the defendant's guilt beyond reasonable doubt, it would be your duty to acquit the defendant.

After the trial court finished its instructions, Davis reserved his right to object to the jury charges.[4]

---

[4] Since Davis reserved his right to object, he preserved this error for appeal. See *Baptiste v. State*, 288 Ga. 653, 658 (4) (706 SE2d 442) (2011). The law regarding the preservation of error for jury instructions in criminal cases changed with the enactment of OCGA § 17-8-58, effective July 1, 2007, which now requires a criminal defendant to inform the court of the specific objection and the grounds for such

"It is axiomatic that no burden is ever placed on a criminal defendant to establish innocence, and charges which place any burden of persuasion upon the defendant in criminal cases shall not be given, and such charges will be deemed erroneous and subject to reversal, absent harmless or invited error." (Punctuation and footnote omitted.) *Bridges v. State*, 268 Ga. 700, 703 (2) (b) (492 SE2d 877) (1997). However, an erroneous jury instruction cannot be considered in isolation, but must be considered in the context of the entire jury charge on the record as a whole to determine whether there is a reasonable likelihood that the jury improperly applied the challenged instruction. Id.

Here, the trial court properly instructed the jury during its oral instructions that Davis was presumed innocent; that the presumption of innocence remained in place until the State overcame the presumption by convincing the jury beyond a reasonable doubt that Davis was guilty; and that, if the State did not prove guilt beyond a reasonable doubt, then the jury was required to acquit Davis. The trial court also repeatedly instructed the jury that the State bore the burden of proving each element beyond a reasonable doubt. Moreover, the written charge correctly stated the law and

objection before the jury retires to deliberate and precludes appellate review where there is a failure to object unless the jury charge constitutes plain error. See id. at n.3. Davis's trial occurred in January 2007.

was sent out with the jury. See *Llewellyn v. State*, 241 Ga. 192, 195 (2) (243 SE2d 853) (1978) (approving the practice of giving the jury written instructions). Considering the instructions as a whole, there is no reasonable likelihood that the trial court's inadvertent slip of the tongue shifted the burden of proof to Davis. See *Pitchford v. State*, 294 Ga. 230, 239 (5) (751 SE2d 785) (2013) (inadvertent slip of the tongue not reversible error). Accordingly, this enumeration presents no grounds for reversal.[5]

3. In his last enumeration of error, Davis contends that his trial counsel was ineffective.

> In order to prevail on a claim of ineffective assistance, [Davis] must show that counsel's performance was deficient and that the deficient performance so prejudiced [Davis] that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. [Davis] must overcome the strong presumption that counsel's conduct falls within the broad range of reasonable professional conduct. In reviewing a lower court's determination of a claim of ineffective assistance of counsel, an appellate court gives deference to the lower court's factual findings, which are upheld unless

---

[5] In its order denying Davis's motion for new trial, the trial court noted that neither counsel specifically objected to the instruction on the burden of proof and the error may have been a transcription error rather than a misstatement in the charge.

clearly erroneous; the lower court's legal conclusions are reviewed de novo.

(Citations and punctuation omitted.) *Hampton v. State*, 279 Ga. 625, 626-627 (619 SE2d 616) (2005).

(a) Davis contends that trial counsel was ineffective in failing to investigate alternate sources of K. C.'s pregnancy, vaginal bleeding and other injuries. We disagree.

Davis testified at trial that he did not touch K. C. in a sexual way. He also testified that he did not know how K. C. was injured, why there was male DNA in her vagina, or what happened to her after she left his home. The defense theory of the case was that K. C.'s version of events was inconsistent and that she was impregnated in early March, after Davis's arrest. At the hearing on Davis's motion for new trial, trial counsel testified that the defense theory was that K. C.'s testimony was not credible in light of the fact that there was no DNA evidence connecting Davis to the crime. Trial counsel testified that he did not investigate alternate sources of injury or pregnancy because the theory of the case was simply that Davis had not attacked K.

11

C.[6] Trial counsel also testified that identifying an alternate sexual partner might have conflicted with the Rape Shield Statute (former OCGA § 24-2-3).[7]

The Rape Shield Statute provides that "in any prosecution for rape, evidence relating to the past sexual behavior of the complaining witness shall not be admissible, either as direct evidence or on cross-examination[.]" (Citations and punctuation omitted.) *Brown v. State*, 225 Ga. App. 49, 51 (1) (c) (483 SE2d 318) (1997); see also *Green v. State*, 221 Ga. App. 436, 437 (472 SE2d 1) (1996) (evidence that 13-year-old victim was sexually active is precisely the type of irrelevant, prejudicial evidence the Rape Shield Statute is intended to exclude).

> The [Rape Shield Statute] is a strong legislative attempt to protect the victim-prosecutrix in rape cases by the exclusion of evidence which might reflect on the character of the witness without contributing materially to the issue of the guilt or innocence of the accused. . . . Where, however, evidence of sexual activity between the victim and persons other than the defendant has been relevant on some issue . . . , we have allowed its admission by creating exceptions to the Rape Shield

---

[6] Davis also asserts that trial counsel's testimony at the new trial hearing was not credible. However, the trial court was authorized to find credible trial counsel's explanation that the decision was tactical. See *Kilpatrick v. State*, 252 Ga. App. 900, 903 (1) (557 SE2d 460) (2001).

[7] Effective January 1, 2013, the Rape Shield Statute is codified at OCGA § 24-4-412.

Statute . . . when the State introduces medical evidence which indicates that the child has been sexually abused[.]

(Citation, punctuation and footnote omitted.) *Williams v. State*, 263 Ga. App. 597, 599 (1) (588 SE2d 790) (2003). Any sexual contact after the crime, however, would not have been relevant to K. C.'s injuries and would have been highly prejudicial. See *Crane v. State*, 199 Ga. App. 548 (2) (405 SE2d 550) (1991) (victim's subsequent sexual activities are prejudicial and irrelevant).

Here, trial counsel's strategy was to show that K. C. was not credible and was impregnated after the rape. "This Court will not, with benefit of hindsight, second-guess defense trial strategies therein. Absent a strong showing that counsel's actions were not reasonable, we will presume that these strategies were not deficient." (Citation omitted.) *Ellicott v. State*, 320 Ga. App. 729, 738 (6) (740 SE2d 716) (2013). Moreover, in light of K. C.'s testimony, her immediate outcry and the corroborating physical evidence, such as the male DNA in her vagina and the vaginal injury consistent with forced penetration, it is not reasonably likely that the result of Davis's trial would have been different even in the absence of trial counsel's alleged errors.

(b) Davis also contends that trial counsel erred in failing to exclude the evidence of K. C.'s pregnancy. Again, we disagree.

At the hearing on Davis's motion for new trial, trial counsel testified that his trial strategy was to show that, based on the doctor's testimony regarding the age of the fetus, K. C. was sexually active and impregnated more than two weeks after the rape occurred. Trial counsel also testified that he believed the destruction of the biological material from K. C.'s abortion was favorable to the defense because the State had no DNA evidence connecting Davis to the crime. Trial counsel's decision to rely on the evidence of pregnancy to help buttress Davis's defense that he did not attack K. C. was a matter of reasonable trial strategy and does not amount to ineffective assistance. "As a general rule, matters of reasonable tactics and strategy, whether wise or unwise, do not amount to ineffective assistance of counsel." (Citation and punctuation omitted.) *Grier v. State*, 273 Ga. 363, 365 (4) (541 SE2d 369) (2001).

Moreover, as set forth above, even assuming trial counsel was deficient in failing to exclude the evidence regarding K. C.'s pregnancy, there is no reasonable probability that the jury's verdict would have been different in light of the overwhelming evidence of Davis's guilt.

14

(c) Davis also contends that trial counsel was ineffective in failing to object to the prosecutor's closing argument. We discern no error.

During closing argument, the prosecutor said that K. C.'s bleeding was evidence of injury. The trial court instructed the jury that counsels' closing statements were not evidence and that the case was to be decided on the facts in evidence, and "qualified jurors under oath are presumed to follow the instructions of the trial court." *Allen v. State*, 277 Ga. 502, 504 (3) (c) (591 SE2d 784) (2004). Accordingly, Davis has not shown that trial counsel was ineffective in failing to object to the prosecutor's closing argument.

(d) Finally, Davis contends that the cumulative effect of trial counsel's errors prejudiced him. "[W]e evaluate only the effects of matters determined to be error, not the cumulative effect of non-errors." *Bulloch v. State*, 293 Ga. 179, 183 (2) (744 SE2d 763) (2013). Here, Davis has not shown that trial counsel's performance was deficient, much less that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different.

In sum, the State did not improperly destroy evidence, the trial court did not err in instructing the jury and trial counsel did not render ineffective assistance.

*Judgment affirmed. Doyle, P. J., and Dillard, J., concur.*

15