S11A1956. CLAY v. THE STATE.

(725 SE2d 260)

THOMPSON, Justice.

This is an interim appellate review of a case in which the State seeks the death penalty. John David Clay has been indicted for malice murder and false imprisonment in connection with the death of Janice Swain in the early morning hours of March 4, 2007. This Court granted Clay's application for interim review and directed the parties to address whether the trial court erred in its order granting in part and denying in part Clay's motion to exclude his statements to law enforcement officers, in granting Clay's motion to suppress his clothing, in ruling that the evidence of Clay's prior convictions would be admissible under OCGA § 24-9-84.1 (b) in the event he testifies at trial, in ruling admissible as similar transaction evidence certain prior acts of Clay, and in denying Clay's motion regarding the State's destruction of blood evidence. For the reasons set forth below, we affirm in part, reverse in part, vacate in part, and remand with direction.

1. Clay challenged the admissibility of four statements made by him to law enforcement officers. The trial court ruled that Clay's first three statements are inadmissible but that his fourth statement is admissible. "The trial court determines the admissibility of a

defendant's statement under the preponderance of the evidence standard considering the totality of the circumstances." (Citation omitted.) *Vergara v. State*, 283 Ga. 175, 176 (657 SE2d 863) (2008). Although we defer to the trial court's findings of disputed facts, we review de novo the trial court's application of the law to the facts. See *Petty v. State*, 283 Ga. 268, 269 (2) (658 SE2d 599) (2008).

The trial court made the following factual findings based upon evidence and testimony presented at combined hearings on Clay's motions to exclude his statements and to suppress his clothing. After Clay was found lying unconscious on Jessica Lane with blood on his clothes at approximately 3:30 a.m. on March 4, 2007, Clay's sister and his friend called 911, which dispatched an ambulance to transport Clay to the hospital emergency room (ER). Glynn County Police Department officers were also dispatched to the scene. At the same time, officers discovered Ms. Swain's body in Room 303 of the Guest Cottages Hotel in Brunswick. Upon learning that Clay had been in Room 303 earlier that day, Investigator Hogue instructed Officer Cupp to go to the hospital, "stand by" with Clay, and obtain a statement from him, if possible. When Officer Cupp arrived at the ER, Clay was still unconscious.

Dr. Jeff Gunderson, who attended Clay in the ER, testified that when Clay arrived at the ER at approximately 4:30 a.m., he was in an unresponsive state and could not be aroused. Even when Dr. Gunderson applied a "sternum rub," which he described as a deep-pain stimulus, Clay only moaned in response. Clay's toxicology tests indicated that he had consumed benzodiazepines (Valium or Xanax), marijuana, alcohol, and cocaine. At approximately 7:00 a.m., Dr. Gunderson checked Clay and noted that he remained intoxicated and unconscious, but another doctor was able to awaken Clay at approximately 8:00 a.m. Officer Cupp was in the room when Clay awoke, and he and Clay engaged in conversation (Statement 1). When Clay was discharged from the ER at approximately 8:48 a.m., he was transported directly to the Glynn County Police Department, where Investigator Hogue conducted a video-recorded interview of Clay at approximately 11:15 a.m. (Statement 2). Clay was placed in a holding cell for observation of his medical condition at approximately 3:15 p.m., and Investigator Hogue conducted an audio-recorded interview inside this cell (Statement 3). Fifteen days later, Clay gave a final audio-recorded interview while incarcerated at the detention center (Statement 4).

A. *Miranda Violations.* Clay alleges that all four statements were obtained in violation of *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). "*Miranda* protections adhere when an individual is (1) formally arrested or (2) restrained to the degree associated with a formal arrest." (Citations omitted.) *Tolliver v.*

*State*, 273 Ga. 785, 786 (546 SE2d 525) (2001). In evaluating this second prong, the test is an objective one, i.e., "an individual is in custody if a reasonable person in the place of the defendant would feel so restrained as to equate to a formal arrest." Id.

(1) *Statement 1.* Officer Cupp was the only witness to testify regarding this unrecorded statement, and, according to his testimony, the following transpired. Upon his arrival at the ER, Officer Cupp confirmed Clay's identity with an armed, uniformed patrol officer from the Glynn County Police Department who was "standing by" an unconscious Clay. After releasing the patrol officer, Officer Cupp took photographs of Clay and removed Clay's items of clothing from a pink and white plastic "personal effects" bag on the counter, listed the items on a property receipt form, and placed the individual items into separate bags. Then Officer Cupp "watched" Clay until he regained consciousness. Officer Cupp was in plain clothes, but he was wearing his badge and revolver on his belt. Even though he did not identify himself to Clay as a law enforcement officer, when Clay awakened, he asked Officer Cupp what he was going to be charged with. Officer Cupp asked Clay whether he had done anything to be charged with, and Clay shook his head in the negative. Clay then asked if he would have a bond, Officer Cupp asked if he had done anything that would require that he have a bond, and Clay again shook his head in the negative. Officer Cupp told Clay that he would "need to come to the police department" to speak to the police once he was released from the hospital. Clay asked why, and Officer Cupp told him that the police needed to find out why he was found in the road with "a knot above his eye" and needed to "speak to him about something that happened at the Guest Cottages."

After Clay and Officer Cupp talked further about Clay's activities on the previous evening, hospital personnel brought discharge papers to Clay. Then Officer Cupp, who had driven an unmarked vehicle to the hospital, immediately called for a transport officer and a patrol vehicle with a cage and child locks to transport Clay to the police department. While waiting on the transport unit, Clay asked Officer Cupp what happened at the Guest Cottages, and the officer told Clay that "someone was dead" there and that the police "need[ed] to find out what he may know or how much involvement he might have had in the death." Clay told Officer Cupp that he did not kill anyone, and Officer Cupp told Clay that he just needed to tell the truth when he got to the police department. Clay again asked if he were going to be charged, and Officer Cupp told him that "if he had done nothing wrong, he had nothing to worry about." Clay was transported to the police department at approximately 9:00 a.m. in

the patrol vehicle. Officer Cupp testified that he did not give Clay his *Miranda* warnings, that he never told Clay that he was free to leave, and that Clay never tried to leave or expressed that he wanted to leave.

The State contends that the trial court erred in finding that Clay was in custody when he made Statement 1 and thus that it was obtained in violation of *Miranda*. Considering the facts that Clay awoke to find a police officer in his treatment room and that that officer avoided Clay's questions regarding whether he was going to be charged, told Clay that he "needed" to come down to the police station to talk with the police, never told Clay that he was not under arrest or that he was free to leave, and called for a patrol vehicle to transport Clay to the police station, we conclude that the trial court was authorized to find that, under the totality of the circumstances, a reasonable person in Clay's position would have perceived that he was in custody at the time he made Statement 1. Accordingly, the trial court did not err in finding that Statement 1 was obtained in violation of *Miranda*. See *McDougal v. State*, 277 Ga. 493, 498 (1) (A) (591 SE2d 788) (2004) (considering the fact that police would make no commitments to the defendant about whether he would be arrested as a factor in favor of custody). Compare *Gabriel v. State*, 280 Ga. 237, 237-238 (2) (626 SE2d 491) (2006) (considering the facts that the defendant was asked whether he would go to the sheriff's office and that he was told that he was not under arrest and was free to leave as factors weighing in favor of not finding custody).

(2) *Statement 2.* The State does not contend that Clay was not in custody at the time of this statement and his remaining statements but, instead, that Clay made a knowing and voluntary waiver of his *Miranda* rights. After his arrival at the police department, Clay was read his *Miranda* warnings by Investigator Hogue prior to being questioned by him. However, our review of the videotape of Statement 2[1] supports the trial court's findings that Investigator Hogue read the *Miranda* warnings in such a " 'super-speed' " manner that the warnings likely could not have been identified "as anything more than gibberish" without having a prior familiarity with *Miranda*. It is axiomatic that a rendering of the *Miranda* warnings must be

---

[1] This Court owes no deference to a trial court's factual findings gleaned from a review of a videotape that are not the subject of testimony requiring the trial court's weighing of credibility or resolving of conflicts in the evidence. See *Green v. State*, 275 Ga. 569, 573 (2), n. 11 (570 SE2d 207) (2002). Here, however, the video recording was not the only evidence before the trial court. Because the physician who treated Clay upon his arrival at the ER, two defense experts, and the officer who interviewed Clay testified at the motions hearings, necessitating credibility determinations by the trial court, the trial court's findings are upheld unless clearly erroneous. Compare *Vergara*, supra at 178 (1) (applying de novo review where the controlling facts, including those discernable from a videotape, were not in dispute).

intelligible before a defendant can knowingly and intelligently waive the rights involved. See *State v. Floyd*, 306 Ga. App. 402, 405-406 (702 SE2d 467) (2010).

The State argues that Clay was familiar with his *Miranda* rights because he had been arrested before. While familiarity with the criminal justice system, and thus with the *Miranda* warnings, may be one factor to consider in determining whether a defendant has knowingly and intelligently waived his rights, see *Humphreys v. State*, 287 Ga. 63, 73 (6) (694 SE2d 316) (2010), such a determination depends on the totality of the circumstances. See *Bishop v. State*, 268 Ga. 286, 287 (2) (486 SE2d 887) (1997). Here, the trial court also found credible the testimony of Clay's medical experts that, based upon their review of Clay's recorded statements and their interviews with Clay, it was their opinion that Clay was experiencing the effects of his drug-induced coma at the time and, thus, could not understand his *Miranda* rights or make a valid waiver of those rights. Considering the totality of the circumstances, we conclude that the trial court did not err in determining that Statement 2 was also obtained in violation of *Miranda*. See *Findley v. State*, 251 Ga. 222, 226 (2) (304 SE2d 898) (1983).

(3) *Statements 3 and 4.* Our review of the audio recordings of Statements 3 and 4 supports the trial court's findings that no *Miranda* warnings were given prior to either of those statements. Given that Clay was in custody at the time he made those statements and that he had not made a valid waiver of his *Miranda* rights before making Statements 1 and 2, the trial court did not err in finding that Statements 3 and 4 were also obtained in violation of *Miranda*. Compare *Williams v. State*, 244 Ga. 485, 488 (4) (b) (260 SE2d 879) (1979) (holding that the State was under no duty to repeat *Miranda* warnings where the defendant had received and waived his *Miranda* rights the day before and the interviews were part of a continuing interrogation).

B. *Voluntariness.* The State also contends that the trial court erred in finding that Statements 1, 2, and 3 were *not* voluntary. The trial court found that Clay's statements were involuntary, because he "did not make [his statements] as the result of rational intellect, did not appear or sound coherent at the time, did not have an appreciation for the situation in which he found himself, and clearly exhibited signs of intoxication and withdrawal symptoms." The trial court's conclusions were based in part on its review of the videotape of Statement 2 and the audiotapes of Statements 3 and 4, from which it made the following factual findings. During Statement 2, Clay stumbled into the room, was visibly shaking, appeared to lapse in and out of consciousness, was incoherent at times, and did not understand the circumstances under which he was being inter-

viewed. During Statement 3, Clay had difficulty answering questions, had slurred speech, and did not recall his interview from four hours earlier or recognize Investigator Hogue from that interview. The trial court noted that, in contrast, Clay was alert and focused and spoke clearly during Statement 4 when he was not intoxicated.

The trial court also considered and found credible the testimony of Dr. Gunderson, who testified for the State, and the testimony of Clay's two expert witnesses, finding that "[a]ll three doctors agreed that [Clay] was severely intoxicated at the time he arrived at the ER, was unconscious, without cognitive functioning, and was obtunded, or dulled to the sensation of pain or stimuli to the point of being unresponsive." Finally, the trial court found credible the testimony of Clay's expert witnesses, both of whom opined that Clay "could not appreciate" his situation and testified that Clay told them that he could not recall any interview with police except the fourth interview two weeks after his arrest.

There is ample evidence in the record to support the trial court's factual findings, and those factual findings support the trial court's legal conclusions that Statements 1, 2, and 3 were not voluntary. See *State v. Folsom*, 286 Ga. 105, 111 (4) (686 SE2d 239) (2009) (considering lucidity and ability to comprehend questions as factors in determining whether a defendant's statement was rendered involuntary as a result of intoxication); *Henson v. State*, 258 Ga. 600, 601 (1) (372 SE2d 806) (1988) (considering coherency, slurred speech, steadiness, awareness of circumstances, and test results for drugs as factors); *Blanchard v. State*, 247 Ga. 415, 417-418 (3) (276 SE2d 593) (1981) (considering an expert's testimony regarding the defendant's ability to understand, talk with, and answer the officers' questions and the defendant's ability to recall his statements as factors). Accordingly, the trial court's determinations are not clearly erroneous and must be upheld. See *Folsom*, supra at 111 (4). Because Statements 1, 2, and 3 were involuntary, the trial court properly held that those statements, which include any spontaneous and unsolicited statements made by Clay in the ER, are inadmissible for all purposes at Clay's trial. See *Mincey v. Arizona*, 437 U. S. 385, 398 (II) (98 SC 2408, 57 LE2d 290) (1978) (holding that "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law").

The trial court's finding that Statement 4 was voluntary is supported by the undisputed evidence in the record. However, the trial court misconstrued the United States Supreme Court's decision in *United States v. Patane*, 542 U. S. 630 (124 SC 2620, 159 LE2d 667) (2004), and held that Statement 4 is generally admissible *even though it was obtained in violation of Miranda*, because it was

voluntary. Although the Supreme Court in *Patane* held that the suppression of the physical fruits of a defendant's unwarned but voluntary statements is not constitutionally required, id. at 634, it reiterated that "the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief." Id. at 639 (II). Accord *Phillips v. State*, 285 Ga. 213, 215 (2) (675 SE2d 1) (2009). Accordingly, the trial court erred in ruling that Statement 4 is admissible in the State's case-in-chief and not merely for impeachment purposes in the event Clay testifies.

2. The State contends that the trial court erred in finding that Officer Cupp's warrantless seizure of Clay's clothing in the ER violated the Fourth Amendment and in granting Clay's motion to suppress.

> [W]hen a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. . . . [T]he trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. . . . [T]he reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.

(Citations, punctuation and emphasis omitted.) *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994). However, as a reviewing court, "[we] owe no deference to the trial court's conclusions of law. Instead, we are free to apply anew the legal principles to the facts." *Espinoza v. State*, 265 Ga. 171, 172 (1) (454 SE2d 765) (1995).

A. *Inevitable Discovery*. The State contends that the trial court erred in not applying the inevitable discovery doctrine to find Clay's clothing admissible. Under that doctrine,

> "there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct."

*Taylor v. State*, 274 Ga. 269, 274-275 (3) (553 SE2d 598) (2001) (quoting *United States v. Terzado-Madruga*, 897 F2d 1099, 1114 (11th Cir. 1990)).

According to the State, had Clay's clothing not been seized in the ER, it would have inevitably been seized at the time of his formal arrest at the police station. The trial court rejected the State's argument, stating that, "[w]hen [Clay] was discharged from the

hospital, [he] was not under arrest by law enforcement." However, the trial court's finding here cannot be reconciled with its finding, discussed in Division 1 above, that *"Miranda* warnings should have been given prior to any statements being elicited from [Clay]" when he awoke in the hospital because he was in custody, as a reasonable person in Clay's situation would not have believed he was free to leave at that time. See *Daniel v. State*, 277 Ga. 840, 842 (2) (597 SE2d 116) (2004) (stating that the test for determining whether a person is seized for Fourth Amendment purposes "is whether '"in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"'" (quoting *Michigan v. Chesternut*, 486 U. S. 567, 573 (108 SC 1975, 100 LE2d 565) (1988)), overruled on other grounds by *Salmeron v. State*, 280 Ga. 735, 737-738 (1) (632 SE2d 645) (2006); 5 AmJur2d Arrest § 4 ("An arrest is the quintessential seizure of a person.").

As also discussed in Division 1, the record amply supports the trial court's conclusion that all of Clay's statements made in the ER were obtained while Clay was in custody, i.e., that Clay was under arrest at least from the point in time when he awoke and spoke to Officer Cupp. Moreover, Officer Cupp relieved an armed, uniformed officer "standing by" the entrance to Clay's treatment room and maintained his position "watch[ing]" Clay until he was awake, and there was no testimony indicating that any change of circumstances occurred that would affect whether Clay was in custody between the time of Officer Cupp's arrival at the ER and the time that Clay awoke and spoke to him. Nevertheless, we need not decide at what point in time that Clay's arrest occurred.[2] Even assuming that a de facto custodial arrest of Clay took place near the time that Officer Cupp first approached an unconscious Clay and, thus, that Clay was under arrest when the seizure of his clothing occurred, that is not the end of our inquiry.

In order for the State to prevail on its claim that Clay's clothing would have inevitably been discovered, the State was also required to show by a preponderance of the evidence that Clay's de facto arrest

---

[2] The State did not assert that the seizure of the bagged clothing was a valid search incident to arrest in the trial court. See *State v. Tye*, 276 Ga. 559, 562 (3) (580 SE2d 528) (2003) (stating that legal issues must be raised and ruled on below in order to be properly considered on appeal). "Furthermore, counsel may not add enumerations of error by way of oral argument." *Butts v. State*, 273 Ga. 760, 771 (31) (546 SE2d 472) (2001). Thus, the issue is not before us. Nor may this additional ground be raised by the State in the trial court once jurisdiction is returned to it. See *Langlands v. State*, 282 Ga. 103, 104 (2) (646 SE2d 253) (2007) (stating that under the "law of the case" rule that is applicable in criminal as well as in civil cases, " 'any ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be' "); OCGA § 9-11-60 (h).

in the ER was legal, that the police would have had a valid reason for taking the bag of clothing to the station, and that the bag of clothing would have inevitably been discovered at the time of Clay's formal arrest at the station. See 3 LaFave, Search and Seizure, § 5.5 (b), pp. 220-229 (4th ed. 2004) (discussing the requirements for justifying a search into containers possessed by an arrestee on the basis of the need to inventory them incident to the arrestee's booking and post-arrest detention). Because the State failed to prove that the clothing would have inevitably been discovered at the time of Clay's formal arrest at the station, we need not decide whether the other requisites were established.

It is true that, if Clay's clothing had remained in the personal effects bag rather than being placed in individual bags by Officer Cupp, a search of the personal effects bag at the time of Clay's formal arrest would have led to its discovery. Further, "it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, *in accordance with established inventory procedures.*" (Emphasis supplied.) *Illinois v. Lafayette*, 462 U. S. 640, 648 (II) (103 SC 2605, 77 LE2d 65) (1983). See 3 LaFave, Search and Seizure, § 5.5 (b), pp. 226-227, 227, n. 69 (4th ed. 2004) (stating that the Supreme Court in *Lafayette* emphasized that the inventory of containers must be " 'in accordance with established inventory procedures' " and collecting cases rejecting the inventory theory where there was no showing as to standard police procedure); *Mooney v. State*, 243 Ga. 373, 378-384 (254 SE2d 337) (1979) (holding that an inventory search of an arrestee's plastic shopping bag pursuant to " 'a standard procedure' " was reasonable), abrogated on other grounds by *Horton v. California*, 496 U. S. 128 (110 SC 2301, 110 LE2d 112) (1990). However, the State presented *no* evidence to show that it was inevitable that such an inventory search would have been conducted. A thorough review of the record reveals *no* evidence that such searches were an invariable, routine procedure at the Glynn County Police Department or Detention Center prior to the incarceration of a person. In fact, the State presented *no* testimony by any officer regarding routine inventory procedures for booking searches. Without such evidence, the State failed to meet its burden, and the inevitable discovery doctrine cannot justify the admission of the evidence. See *Davis v. State*, 262 Ga. 578, 583 (4) (422 SE2d 546) (1992). Accord, e.g., *United States v. Gorski*, 852 F2d 692, 695-697 (2d Cir. 1988).

B. *Plain View*. The State also contends that Clay's clothing is admissible under the "plain view" doctrine. "It is well-established that a warrantless search is legitimate under the 'plain view' exception only where the incriminating character of the item is

immediately apparent." *Brown v. State*, 269 Ga. 830, 831 (1) (504 SE2d 443) (1998). In other words, " '[a] policeman does not have the right to seize any object in his view in order to examine it and determine if it is or would be evidence in a criminal prosecution.' " (Citation omitted.) 3 LaFave, Search and Seizure, § 7.5 (b), p. 675 (4th ed. 2004).

The evidence in this case showed that all that was in plain view when Officer Cupp seized the bagged clothing from the counter was the pink and white personal effects bag itself and that, without opening the bag, it was not a "foregone conclusion" that the bag contained Clay's bloody clothes. Therefore, the "plain view" doctrine cannot support his full-blown search of the bag. See *Lamar v. State*, 278 Ga. 150, 154 (6) (598 SE2d 488) (2004) (noting that a showing of probable cause to seize a container in plain view does not alone demonstrate that a warrant is not required to search the contents of a container). Compare *United States v. Davis*, 657 FSupp.2d 630, 638-641 (II) (A) (2) (D. Md. 2009) (finding seizure and search of bag of bloody clothing justified under plain view doctrine because it was a "foregone conclusion" that white plastic bag labeled "Patient's Belonging Bag" beneath bed of defendant receiving treatment in hospital ER would contain his clothing and that clothing would constitute evidence of shooting).

C. *Exigent Circumstances.* To the extent that the State raises the theory of exigent circumstances, that argument is also unavailing. "Whether exigent circumstances precluded obtaining a warrant is a question of fact to be determined by the trial court. The judge's decision, if supported by any evidence, is to be accepted." (Citations omitted.) *Butler v. State*, 185 Ga. App. 478, 480 (2) (364 SE2d 612) (1988). The trial court found that no exigent circumstances prevented law enforcement from obtaining a search warrant to obtain Clay's clothing. Pretermitting whether the trial court's finding was clearly erroneous regarding whether an exigency existed that would justify the *seizure* of the bagged clothing, we cannot conclude that it was clearly erroneous with respect to whether such an exigency existed to justify a warrantless *search* of the bag. See 3 LaFave, Search and Seizure, § 5.5 (c), p. 238 (4th ed. 2004) (stating that exigencies which can be overcome by mere seizure do not justify a warrantless search).

D. *Consent.* Finally, the State's reliance on consent is also without merit, assuming arguendo that the issue is properly before us. See *State v. Tye*, supra, 276 Ga. at 562 (3) (stating that legal issues must be raised and ruled on below in order to be properly considered on appeal). The State presented no evidence that Clay freely and voluntarily consented to the search and seizure of his bagged clothing. See *Brooks v. State*, 285 Ga. 424, 425 (677 SE2d 68)

(2009). Accordingly, because the State failed to show that the warrantless search and seizure of the personal effects bag containing Clay's clothing came within an exception to the warrant requirement, the trial court did not err in suppressing this evidence.

3. The State served notice of its intent to use evidence of five prior convictions of Clay to impeach his credibility under OCGA § 24-9-84.1 should he testify at trial. The trial court ruled that evidence of Clay's 2007 misdemeanor conviction for giving false information to law enforcement is admissible in the event Clay testifies, and Clay does not appeal that ruling. See OCGA § 24-9-84.1 (a) (3); *Brooks v. State*, 285 Ga. at 250 (4) (d). The trial court ruled that evidence of Clay's 2001 burglary conviction is not admissible to attack Clay's credibility, because "the probative value of the conviction does not substantially outweigh the prejudicial effect." See OCGA § 24-9-84.1 (a) (2). The State may not appeal this ruling. See *State v. Martin*, 278 Ga. 418, 420 (603 SE2d 249) (2004) (finding that the interim review procedure does not expand the scope of matters over which the State may appeal); *Berky v. State*, 266 Ga. 28, 29 (463 SE2d 891) (1995) (stating that the State may not appeal an adverse evidentiary ruling based upon a general rule of evidence). The trial court ruled that evidence of Clay's three remaining prior felony convictions, which are a 1997 aggravated assault conviction, a 1998 aggravated assault conviction, and a 1998 terroristic threats conviction, is admissible to impeach his credibility in the event he testifies. We address below Clay's arguments that the trial court erred with respect to this ruling.

A. *Calculation of the ten-year time period.* It is first necessary to determine whether the trial court correctly calculated the ten-year time limit prescribed in OCGA § 24-9-84.1 (b). That provision requires that a conviction be submitted to a stricter balancing than that set forth in subsection (a) "if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness or the defendant from the confinement imposed for that conviction, whichever is the later date." However, the statute does not address at what point the ten-year period should stop running. The State maintains that the appropriate end point is the date of the crimes for which Clay will be tried in this case, which means that none of Clay's prior convictions would fall outside the ten-year time period and that all of them would be subject to the less strict balancing under OCGA § 24-9-84.1 (a) (2). On the other hand, Clay argues that the trial court was correct in its determination that the three convictions were outside the ten-year limit, because ten years have already passed since the date of Clay's convictions and, thus, his trial and any possible testimony by him must necessarily fall outside the prescribed limit.

The issue as to what end date to use in determining the ten-year period under subsection (b) is an issue of first impression in Georgia courts. See *Dozier v. State*, 311 Ga. App. 713, 715 (716 SE2d 802) (2011) (assuming, without discussion, that the end point in calculating the trial period was the date of trial); *Massey v. State*, 306 Ga. App. 180, 182-183 (2) (702 SE2d 34) (2010) (declining to reach the issue of whether the trial court erred in using the date of the burglary for which the defendant was on trial as the end date, because any error in admitting the prior conviction was harmless). Recognizing that "the language of OCGA § 24-9-84.1 (b) mirrors that of Rule 609 (b) of the Federal Rules of Evidence and the statutes based on Rule 609 (b) that have been enacted by several other states," we have previously held that it is proper to "look for guidance to the judicial decisions of the federal courts construing Rule 609 (b) and the courts of our sister states construing their statutes modeled on Rule 609 (b)" in interpreting that provision. *Allen v. State*, 286 Ga. 392, 395 (2) (687 SE2d 799) (2010). See also *Hinton v. State*, 280 Ga. 811, 819 (7) (631 SE2d 365) (2006).

A review of such judicial decisions reveals the "uncertainty about what event concludes the running of the 10-year period." 4 J. Weinstein, Weinstein's Federal Evidence § 609.06 (2) (2d ed. 2003). At least four different end points have been identified by various jurisdictions. See *United States v. Cohen*, 544 F2d 781, 784 (5th Cir. 1977) (identifying the date trial commenced as the end date); *United States v. Coleman*, 11 FSupp.2d 689, 692 (W.D. Va. 1998) (identifying the date the witness testified as the end date); *Minnesota v. Ihnot*, 575 NW2d 581, 585 (Minn. 1998) (identifying the date of the new charged offense as the end date); *United States v. Maichle*, 861 F2d 178, 181 (8th Cir. 1988) (identifying the date of the defendant's indictment as the end date). The State relies on *Ihnot*, supra, to support its position that the most appropriate end date is the date of the new charged offense. However, for the reasons discussed below, we agree with several other courts that have thoroughly considered the *Ihnot* decision and rejected its reasoning and conclusion. See *Washington v. Ong*, No. 63825-4-I, 2009 WL 4024841, at *3 (Wash. Ct. App. 2009); *Illinois v. Naylor*, 864 NE2d 718, 724 (Ill. Ct. App. 2007); *Whiteside v. Indiana*, 853 NE2d 1021, 1027-1028 (I) (Ind. Ct. App. 2006).

In reaching its conclusion, the *Ihnot* court first observed that both the trial date and the date of testimony may be manipulated to allow the ten-year time limit to expire. Id. at 585. However,

> evidence [of remote convictions i]s not inadmissible as a matter of law; by the express terms of OCGA § 24-9-84.1 (b), the trial court is vested with the discretion to admit

> evidence of an older conviction in the interest of justice [based on specific facts and circumstances] if its probative value substantially outweighs its prejudicial effect.

*Treadwell v. State*, 285 Ga. 736, 742-743 (3) (684 SE2d 244) (2009). See OCGA § 24-9-84.1 (b). Therefore, a trial court may consider circumstances that are relevant to the reason why the defendant's case did not come to trial within the ten-year limit. Thus, dilatory tactics are not likely to be successful in preventing the introduction of prior conviction evidence that possesses significant probative value. Accord *Whiteside*, supra at 1027-1028 (I).

We also disagree with the *Ihnot* court that using the trial date or the date of testimony has no policy justification. See *Ihnot*, supra at 585. Clearly, the purpose of OCGA § 24-9-84.1 is to properly balance the probativeness against the prejudicial effect of a witness' prior conviction on the issue of that witness' credibility. Therefore, in selecting an end date, " 'the time of testimony is most appropriate since the jury must determine credibility *at that moment.*' " *Trindle v. Sonat Marine*, 697 FSupp. 879, 882 (E.D. Pa. 1988) (quoting 3 J. Weinstein, Weinstein's Evidence, Par. 609, at 112 (1987)). Accord *Whiteside*, supra at 1028 (I). See *United States v. Cathey*, 591 F2d 268, 274 (III), n. 13 (5th Cir. 1979) (noting that the concern is the witness' credibility when he testifies and, thus, that the correct end point may be that date, which in protracted cases could be considerably later than the trial commencement date previously adopted by that court).

The *Ihnot* court also reasoned that " 'if prior convictions lose their probative value for impeachment purposes because of ten years of "good behavior," that is the period we should measure — the period of unquestioned good behavior.' " Id. (quoting *Cathey*, supra at 277, n. 2 (Fay, J., dissenting)). In *Ihnot*, as here, the person sought to be impeached was the defendant. Under those circumstances, "the reasoning that the good behavior of a person with a prior conviction ends on the date of the charged offense . . . implies that the defendant is guilty of the charged offense before he or she has been so found," a reasoning that we reject. *Whiteside*, supra at 1028 (I). We find it more desirable that, instead, a trial court consider whether a defendant has been incarcerated for an extended period of time awaiting trial and any other relevant circumstances that may have prevented the defendant's case from coming to trial within the ten-year time limit. See *Strickland v. Mississippi*, 980 S2d 908, 920 (II) (Miss. 2008) (applying "the 'interes[t] of justice' exception" contained in a state evidence rule analogous to Federal Rule 609 (b) to allow the admission of prior conviction evidence, where the defendant's flight prevented his case from coming to trial before the

time limit expired).

Moreover, subsection (b) makes no distinction between a defendant and a non-party witness and applies to both civil and criminal cases. "[T]here is no basis in logic or policy for using the date of a charged criminal offense as the endpoint for a witness other than [a] criminal defendant." *Minnesota v. Munger*, 597 NW2d 570, 573 (Minn. Ct. App. 1999) (declining to extend the *Ihnot* rule where the witness sought to be impeached was not the defendant charged with a criminal offense). We see no necessity or justification for adopting various end dates under OCGA § 24-9-84.1.

Considering all of the above, we adopt the date the witness testifies or the evidence of the prior conviction is introduced as the end point for determining whether a conviction falls within the ten-year limit prescribed by OCGA § 24-9-84.1 (b). Accordingly, the trial court correctly determined that Clay's three prior convictions at issue here are more than ten years old and utilized the stricter balancing test set forth in subsection (b). Absent an abuse of the trial court's discretion, we will not disturb a determination regarding the admissibility of prior conviction evidence under that provision. See *Treadwell*, supra at 743 (3).

B. *The trial court's balancing*. Clay contends that the trial court abused its discretion in finding that the probative value of Clay's prior convictions substantially outweighs their prejudicial effect. This Court has provided little guidance to the trial courts regarding what constitutes an abuse of discretion in admitting such convictions under OCGA § 24-9-84.1. See *Treadwell*, supra at 743 (3) (pretermitting the defendant's assertion that the trial court's findings were insufficient under OCGA § 24-9-84.1 (b)). Again looking to federal courts and our sister state courts for guidance, we note that most courts utilize a five-factor analysis for weighing a prior conviction's probity regarding the accused's veracity against the prejudice to the accused under Federal Rule 609 (b) or an analogous state evidentiary rule. This analysis includes the following factors: (1) the nature, i.e., impeachment value of the crime; (2) the time of the conviction and the defendant's subsequent history; (3) the similarity between the past crime and the charged crime, so that admitting the prior conviction does not create an unacceptable risk that the jury will consider it as evidence that the defendant committed the crime for which he is on trial; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue. See *United States v. Pritchard*, 973 F2d 905, 908-909 (11th Cir. 1992); Jeffrey Bellin, *Circumventing Congress: How the Federal Courts Opened the Door to Impeaching Criminal Defendants with Prior Convictions*, 42 U. C. Davis L. Rev. 289, 317, n. 110 (2008) (stating that this "five-factor framework, or a close variant," governs review of impeachment

rulings in 10 of the 12 federal circuits that consider criminal appeals and many state jurisdictions that are governed by evidentiary rules that are analogous to Federal Rule 609).[3] While this list is not exhaustive and we recognize that a trial court has the discretion to consider other factors as it may deem appropriate in a particular case, we find that these five factors outline the basic concerns relevant to the required balancing. See 6 Weinstein's Federal Evidence § 609.04 (2) (a). Accordingly, we adopt the application of these five factors in conducting the balancing required under OCGA § 24-9-84.1 (b).

However, the trial court did not list the specific factors that it relied on in finding that the prior conviction evidence is admissible, and Clay contends that the trial court's failure to do so was an abuse of discretion. Clay relies on *Abercrombie v. State*, 297 Ga. App. 522, 524 (1) (677 SE2d 719) (2009), to support his contention, but we are not bound by that decision, nor do we find it persuasive. The Court of Appeals in *Abercrombie* indicated that a trial court is required to give specific reasons for its ruling on the probity of the prior convictions under subsection (a) (2). See id. at 524 (2). However, that portion of the decision has not been consistently followed and has even been questioned by the Court of Appeals. See *Lawrence v. State*, 305 Ga. App. 199, 203 (3), n. 3 (699 SE2d 406) (2010) (noting that *Quiroz*, supra at 428 (4), upon which *Abercrombie* relied, "requires only that an express finding of the probity be made to ensure that the court engaged in a meaningful analysis"). But see *Dozier*, supra at 717 (citing *Abercrombie* for the proposition that a trial court must make express findings regarding the relevant factors under OCGA § 24-9-84.1 (a) or (b)).

Moreover, OCGA § 24-9-84.1 (a) (2) is applicable to determining the admissibility of evidence of a defendant's prior felony convictions that do not come within subsection (b) because they are less than ten years old. Its less stringent standard provides that evidence of a testifying defendant's prior conviction is admissible if the trial court "determines that the probative value of admitting the evidence substantially outweighs its prejudicial effect to the defendant[.]" While the Court of Appeals has properly held that, under subsection (a) (2), a trial court must make an on-the-record finding that the probative value of admitting a prior conviction substantially outweighs its prejudicial effect, see *Quiroz*, supra at 428 (4), we discern no requirement in the language of OCGA § 24-9-84.1 (a) (2) that the

---

[3] We note that the Court of Appeals has adopted a modified version of this five-part analysis. See, e.g., *Quiroz v. State*, 291 Ga. App. 423, 428 (4) (662 SE2d 235) (2008) (holding that trial courts should consider the kind of felony involved, the date of the conviction, and the importance of the witness' credibility).

trial court *must* list the specific factors it considered in ruling on the probity of convictions that are not more than ten years old. See *United States v. Preston*, 608 F2d 626, 639 (5th Cir. 1979) (holding that before admitting a prior conviction into evidence under Federal Rule 609 (a) (1), a district court must state on the record that its probative value exceeds its prejudicial impact and stating that, although not mandated by the rule, it would be useful if the trial judge "explicitly identified and weighed" the "pertinent factors").[4] Accord *United States v. Portillo*, 699 F2d 461, 463-464 (9th Cir. 1982). Therefore, we now hold that, to the extent that *Abercrombie*, supra, and *Dozier*, supra, hold otherwise, they are overruled.

However, subsection (b) applies to prior felony convictions that are more than ten years old, and it requires different determinations by the trial court than subsection (a) (2) before evidence of a prior felony conviction may be introduced. As discussed above, the evidence "is not admissible . . . unless the court determines, in the interest of justice, that the probative value of the conviction *supported by specific facts and circumstances* substantially outweighs its prejudicial effect." (Emphasis supplied.) OCGA § 24-9-84.1 (b). Again recognizing that the General Assembly chose to use the language of Federal Rule 609 (b) in enacting OCGA § 24-9-84.1 (b), we find enlightening the Senate Report on the Rules of Evidence. With regard to Federal Rule 609 (b), the Senate Report pertinently states the following:

> It is intended that convictions over 10 years old will be admitted very rarely and only in exceptional circumstances. The rules provide that the decision be supported by specific facts and circumstances *thus requiring the court to make specific findings on the record as to the particular facts and circumstances it has considered* in determining that the probative value of the conviction substantially outweighs its prejudicial impact.

(Emphasis supplied.) U. S. Code Cong. & Admin. News, 93d Cong., 2d Sess. at p. 7062 (1974).

As the Fourth Circuit has explained,

> Congress in giving the District Court a narrow and limited discretion under its formulation of 609 (b) to admit a conviction more than ten years old for purposes of impeach-

---

[4] The Eleventh Circuit has adopted as binding precedent decisions made by the Fifth Circuit handed down on or before September 30, 1981. *Bonner v. City of Prichard*, 661 F2d 1206, 1209 (11th Cir. 1981) (en banc).

ment, hedged the exercise of that discretion about by a clearly defined constraint capable of being satisfied only by a specific finding resting on "specific facts and circumstances." This conclusion follows, also, from the [fact] that the District Court's decision to admit such conviction is subject to appellate review for abuse. It is axiomatic that in the absence of any findings by the District Court and any articulation of the "specific facts and circumstances" supporting its decision, there can be no meaningful appellate review of that decision.

(Footnotes omitted.) *United States v. Cavender*, 578 F2d 528, 532 (4th Cir. 1978) (footnotes omitted.) Finally, we note that "the case law, while not entirely consistent, assumes that [Federal] Rule 609 (b) requires an on-the-record finding." *United States v. Mahler*, 579 F2d 730, 735-736 (2d Cir. 1978).

Based on the foregoing, we conclude this is the better rule. Therefore, we hold that a trial court must make an on-the-record finding of the specific facts and circumstances upon which it relies in determining that the probative value of a prior conviction that is more than ten years old substantially outweighs its prejudicial effect before admitting evidence of the conviction for impeachment purposes under OCGA § 24-9-84.1 (b). To the extent *Treadwell*, supra at 742-743 and *Wilkes v. State*, 293 Ga. App. 724, 726 (2) (667 SE2d 705) (2008) can be interpreted to hold otherwise, they are overruled.

Our review of the record here shows the trial court failed to make express findings in determining that evidence of Clay's prior convictions is admissible. Accordingly, we remand this case to the trial court to enter express findings on the record as to whether, in the interest of justice, the probative value of Clay's three prior felony convictions at issue substantially outweighs their prejudicial effect, based on the factors set forth above and any other facts and circumstances the trial court may deem relevant.

4. Clay argues that the trial court erred in ruling that evidence of his prior convictions for terroristic threats and battery is admissible as similar transaction evidence at trial without first making the necessary findings in accordance with *Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991). In *Williams*, we held that before any similar transaction evidence may be admitted into evidence, a hearing must be held pursuant to Uniform Superior Court Rule 31.3 (B), at which the State is required to make three affirmative showings as to each similar transaction that it seeks to introduce. See id. Specifically, the State must show the following: (1) the independent offense or act is offered "not to raise an improper inference as to the accused's character, but for some appropriate

purpose which has been deemed to be an exception to the general rule of inadmissibility"; (2) the accused committed the independent offense or act; and (3) there is a "sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter." Id. After the 31.3 (B) hearing and before any similar transaction evidence may be introduced to the jury, the trial court must make an on-the-record determination that each of these three showings has been satisfactorily made by the State as to each particular independent offense or act. See id.

Our review of the record here shows that the trial court neither observed the procedures prescribed in *Williams* nor provided the State the opportunity to do so. Thus, the trial court could not and did not make specific determinations as to whether the State had satisfactorily made the requisite affirmative showings. Accordingly, we remand this case to the trial court to conduct a proper Rule 31.3 (B) hearing and to make the requisite findings on the admissibility of the similar transaction evidence at issue here.[5] See *Hall v. State*, 230 Ga. App. 741, 742 (497 SE2d 603) (1998).

5. Finally, Clay claims that the trial court erred in denying his motion for relief due to the State's destruction of blood evidence. A review of the testimony and evidence presented at a hearing on Clay's motion shows the following uncontroverted facts.

Pursuant to a search warrant, four vials of blood were drawn from Clay for the purposes of DNA analysis on the afternoon of March 6, 2007, more than 48 hours after the crimes were committed. The four vials of blood were subsequently received as a "reference sample" at the GBI Crime Lab, and samples from the vials were made into bloodstain cards for the purpose of DNA testing, which was conducted. In October 2008, Clay filed general motions to preserve all biological evidence and for access to such evidence.

According to the Crime Lab's policy, after blood samples are maintained for a period of 12 months, they are destroyed at the beginning of the next calendar year *unless* a request is made to maintain them. As the Crime Lab had received no such request in Clay's case, the blood samples were destroyed "in the normal workings of business" on January 21, 2009, while the bloodstain cards that were created from the blood samples were retained. Earlier on the same day that the samples were destroyed, the trial

---

[5] The trial court also ruled that evidence of two of Clay's convictions was inadmissible as similar transaction evidence, a ruling that the State may not appeal. See *State v. Lynch*, 286 Ga. 98, 102 (2) (686 SE2d 244) (2009) (holding that a trial court's ruling excluding similar transaction evidence was not on the ground that it was obtained illegally and thus was not appealable); *Martin*, supra at 420.

court orally granted Clay's motion to preserve evidence at a hearing on non-evidentiary motions in Clay's case. On February 23, 2009, when Clay's expert neuro-pharmacologist asked defense counsel about the possibility of conducting independent testing of the blood samples, defense counsel contacted the State about gaining access to the samples. The State learned the following day that the samples had been destroyed and then notified Clay.

A. *Alleged Violation of OCGA § 17-5-56.* Clay contends that the State was obligated to preserve the vials of blood under OCGA § 17-5-56. Subsection (a) of that provision requires the State to "maintain any physical evidence collected at the time of the crime that contains biological material, including, but not limited to, stains, fluids, or hair samples that relate to the identity of the perpetrator of the crime." However, subsection (a) also provides that "[b]iological samples collected directly from any person for use as reference materials for testing . . . shall not be preserved." OCGA § 17-5-56 (a). It is undisputed that the destroyed samples were collected from Clay for use as reference materials for DNA analysis. Nevertheless, Clay maintains that, by filing a motion challenging the admissibility of Clay's statements, the defense put the State on notice that Clay's level of intoxication at the time of the crimes was an issue in this case. Clay contends that, at that point, the samples ceased being "merely" reference materials and, instead, became "irreplaceable biological evidence" that the State was obligated to preserve under OCGA § 17-5-56.

However, even assuming Clay's motion put the State on notice that his level of intoxication was an issue in determining whether his statements to law enforcement officers were voluntary, it did not indicate Clay was claiming his intoxication made him physically incapable of committing the crimes and, thus, he could not have been the perpetrator. Because OCGA § 17-5-56 requires the preservation of biological materials "that relate to the identity of the perpetrator," not samples that a defendant may seek with regard to an issue unrelated to identity, such as his level of intoxication, Clay's contention here is meritless. Furthermore, Clay failed to provide any citation to authority to support his contention that the term "reference materials" has such a variable meaning, and we find the statute's plain and unambiguous language is subject to only one meaning. Accordingly, because the blood samples were reference materials and, by the statute's express language, reference materials are not required to be preserved, see OCGA § 17-7-56 (a), Clay's argument on this issue fails. See *Abdulkadir v. State*, 279 Ga. 122, 123 (2) (610 SE2d 50) (2005) ("Where the language of a statute is plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly"), superseded by

statute on other grounds as stated in *Krirat v. State*, 286 Ga. App. 650, 653 (1) (649 SE2d 786) (2007).

B. *Alleged Violation of OCGA § 17-16-4.* Clay also claims that the destruction of the blood samples constitutes a failure by the State to comply with the reciprocal discovery requirements pursuant to OCGA § 17-16-4. Assuming without deciding that the blood samples came within the scope of OCGA § 17-16-4 (a) (3) (A) (requiring that the prosecution make available to the defense all "tangible objects . . . which are within the possession, custody, or control of the state or prosecution" that were obtained from the defendant), we conclude that the trial court did not abuse its discretion in denying Clay's claim here. See *Childs v. State*, 287 Ga. 488, 493 (5) (696 SE2d 670) (2010).

Clay proposed two remedies for the State's alleged discovery violation: (1) the exclusion of Clay's statements and (2) the provision of instructions to the jury that it is to accept as an established fact that Clay ingested a specific amount of certain drugs prior to the crimes, which would necessitate the exclusion of any contradictory evidence by the State. In order to obtain the exclusion of evidence for the State's alleged discovery violation, Clay must show both prejudice and bad faith. See *Bryant v. State,* 288 Ga. 876, 888 (9) (b) (2) (708 SE2d 362) (2011); OCGA § 17-16-6. Although the trial court's written order denied Clay's motion without making factual findings or legal conclusions, at the conclusion of the hearing on Clay's motion, the court orally found nothing "wilfully wrong" in the GBI's destruction of the blood samples, a finding that is supported by the evidence in the record. Accordingly, Clay has not shown that the State acted in bad faith, and his contention here is meritless.

C. *Alleged Due Process Violation.* Finally, Clay argues that his due process rights were violated because the destruction of the blood samples denied him access to exculpatory evidence.

> In dealing with the failure of the state to preserve evidence which might have exonerated the defendant, a court must determine both whether the evidence was material and whether the [State] acted in bad faith in failing to preserve the evidence. *Arizona v. Youngblood*, 488 U. S. 51 (109 SC 333, 102 LE2d 281) (1988). To meet the standard of constitutional materiality, the evidence must possess an exculpatory value that was apparent before it was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U. S. 479 (104 SC 2528, 81 LE2d 413) (1984).

*Walker v. State*, 264 Ga. 676, 680 (449 SE2d 845) (1994).

Clay claims that the blood samples were constitutionally material, because "[they] would establish that [he] was too intoxicated to have committed the crimes with which he is charged." However, a review of the record shows that Clay overstates the potential exculpatory value of the blood samples, as the testimony of Clay's expert neuro-pharmacologist, Dr. Jonathan Lipman, shows that any test results from the blood samples would, at best, be of limited usefulness in Clay's attempt at exoneration.

Dr. Lipman testified that, had the blood samples been appropriately analyzed, the results could have confirmed Clay's self-report of his drug use on the day of the crimes, particularly his use of Soma, a barbiturate that, when used in combination with the drugs revealed in Clay's urine drug screen conducted at the ER,[6] would have caused "a highly inflammatory mix." However, Dr. Lipman acknowledged that the most that could be accomplished by conducting a forensic toxicology test on any blood drawn more than 48 hours after the crimes would be to determine whether the drug or its metabolite was still present in the blood at that time. If there were a large amount of the drug or its metabolite after that period of time, Dr. Lipman testified, in a "sort of semi-quantitative way," he might possibly be able "to say something about" the enormous amount of drugs that were in Clay's system prior to that. He also testified that, even if Clay had not taken Soma at all on the day of the murder, the drug or its metabolite "would likely still have been in his blood," because, according to Clay, "he was pounding this stuff daily." "[S]uch potential usefulness 'does not establish that the [blood samples] had an "obvious" or "readily perceived" *exculpatory* value.' " (Citations omitted.) *Johnson v. State*, 289 Ga. 106, 109 (4) (709 SE2d 768) (2011). Accordingly, the blood samples were not constitutionally material. See *State v. Miller*, 287 Ga. 748, 754-755 (699 SE2d 316) (2010).

Furthermore, Clay has failed to show that the State acted in bad faith in allowing the vials of blood to be destroyed. Clay urges this Court to find that the destruction was done in bad faith because "the State violated multiple State statutes and a court order after the defense specifically requested that the evidence be preserved." However, as discussed above, the State did not violate any statutes by allowing the destruction of the blood vials according to standard GBI procedures. Further, our review of the record shows that the re-

---

[6] The urine drug screen conducted through the hospital did not test for the presence of Soma. The urine specimen used in that screen was forwarded to a laboratory and eventually discarded according to the laboratory's specimen retention policy.

quests to which Clay refers are generalized form motions and, thus, were insufficient to put the State on notice of the samples' alleged exculpatory value.

Moreover, a review of the record clearly establishes that the blood samples were destroyed just a few hours after the trial court orally granted Clay's general motion and before the hearing was concluded and that the blood samples were never mentioned at the hearing, despite the trial court's inquiry of defense counsel at that time as to what specific items Clay desired to be independently tested. Accordingly, we find nothing in the record from which it could be concluded that the exculpatory value of blood drawn from Clay more than 48 hours after the commission of the crimes for the purposes of DNA analysis was obvious or evident to the prosecutor or any other State actor before the vials of blood were destroyed. See *Miller*, supra at 754. Without an awareness that the known blood samples were critical evidence, the State's failure to notify the Crime Lab to preserve the samples prior to their destruction and the Crime Lab's resultant destruction of the samples according to its standard procedure does not constitute a bad faith effort on the State's part to deny Clay access to potentially useful evidence. See *State v. Mussman*, 289 Ga. 586, 591 (2) (713 SE2d 822) (2011) (holding that following a standard policy, by itself, is not evidence of bad faith where the defendant fails to show that the State actors, by their conduct, exhibited some intent to wrongfully withhold constitutionally material evidence from the defendant). Accordingly, the trial court did not err in denying Clay's motion regarding the destruction of the blood evidence.

*Judgment affirmed in part, reversed in part, vacated in part, and case remanded with direction. All the Justices concur.*

DECIDED MARCH 19, 2012 —
RECONSIDERATION DENIED APRIL 11, 2012.

*Joseph W. Vigneri, Jason R. Clark*, for appellant.

*Jacquelyn L. Johnson, District Attorney, Jonathan R. Miller III, Andrew J. Ekonomou, Assistant District Attorneys, Samuel S. Olens, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Patricia Attaway Burton, Senior Assistant Attorney General*, for appellee.